# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**DANIEL ROBERT MARTIN,**

     **Plaintiff,**

**vs.**                                     **CIVIL ACTION NO. 2:20-CV-00772**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered November 25, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 12, 13)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Claimant's request for remand (ECF No. 12), **DENY** the Defendant's request to affirm the final decision (ECF No. 13), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Daniel Robert Martin, (hereinafter referred to as "Claimant"), protectively filed his applications on September 24, 2018 alleging disability since April 1, 2013[1] because of blindness or low vision, arthritis, carpal tunnel syndrome, back pain, acid reflux, high cholesterol, and bilateral knee problems (Tr. at 12, 258-259, 295). His claims were initially denied on February 25, 2019 (Tr. at 77-98, 99-120) and again upon reconsideration on August 21, 2019 (Tr. at 182-188, 189-197). Thereafter, Claimant filed a written request for hearing on October 25, 2019 (Tr. at 198-199).

An administrative hearing was held on April 7, 2020 before the Honorable Melissa Hammock, Administrative Law Judge ("ALJ") (Tr. at 28-52). On April 21, 2020, the ALJ entered an unfavorable decision (Tr. at 9-27). On April 28, 2020, Claimant sought review by the Appeals Council of the ALJ's decision (Tr. at 252-255). The ALJ's decision became the final decision of the Commissioner on October 20, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On November 25, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 12), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 13), and finally, Claimant filed a Reply Brief (ECF No. 14). Consequently, this matter is fully briefed and ready for resolution.

---

[1] The record shows a prior unfavorable decision dated April 5, 2016; the Appeals Council denied review of same on April 4, 2017 (Tr. at 53-72, 73-76). Claimant did not appeal.

**Claimant's Background**

Claimant was considered a "younger person" on the alleged onset date, and subsequently, a "person closely approaching advanced age" as of the applications filing date and date last insured ("DLI"), and by the time of the hearing, had changed age categories again, to a "person of advanced age." See 20 C.F.R. §§ 404.1563(c)-(e), 416.963(c)-(e). (Tr. at 99) Claimant graduated high school and testified that he participated in special education classes. (Tr. at 37) Claimant last worked as a janitor in 2013. (Id.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

>At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## **Summary of ALJ's Decision**

In this case, the ALJ found Claimant met the insured status requirements through September 30, 2017. (Tr. at 14, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of April 1, 2013. (Id., Finding No. 2) At the second inquiry, the ALJ found that Claimant had the following severe impairments: bilateral carpal tunnel syndrome; osteoarthritis; degenerative disc disease; spondylosis; right eye blindness; depression; anxiety; and somatic disorder. (Tr. at 15, Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work except he can:

>occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. The claimant can perform tasks that could be performed with monocular vision. He can frequently handle, finger, and feel bilaterally. He must avoid concentrated exposure to extreme cold and vibration, and have no exposure to unprotected heights or moving mechanical parts. The claimant can perform simple, routine tasks and make simple work related decisions. He can have frequent interaction with supervisors and coworkers, but only occasional interaction with the public. The claimant can adapt to occasional changes in the work routine.

(Tr. at 17, Finding No. 5) At step four, the ALJ found Claimant was capable of performing past

relevant work as a Commercial Cleaner. (Tr. at 20, Finding No. 6) Finally, the ALJ determined Claimant had not been under a disability since April 1, 2013 through the date of the decision. (Tr. at 20, Finding No. 7)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's RFC assessment is not supported by substantial evidence because she failed to properly consider the medical opinion provided by Claimant's treating physician, Gregory Darnell, M.D., regarding his ankle impairment which showed that Claimant was not capable of performing at the medium work at the time of the hearing. (ECF No. 12 at 14-17). Claimant contends the ALJ instead found state agency consultants' opinions more persuasive, despite the fact they issued their opinions prior to Claimant's ankle surgery. (Id.) Claimant asserts this prejudiced his claims because the medium RFC determination eliminated his eligibility for benefits based on the medical-vocational guidelines. (Id.) Claimant further argues that the ALJ's consideration of his daily activities and medical treatment do not corroborate the medium-exertional RFC finding. (Tr. at 17-18) Claimant requests an award of benefits, or remand to correct these errors. (Id. at 18)

In response, the Commissioner asserts that the RFC assessment is supported by substantial evidence as she properly applied the current Regulations when she found Dr. Darnell's opinion less persuasive. (Tr. at 13 at 11-15) As of the date of Dr. Darnell's opinion, Claimant's ankle had stabilized, his wounds were healing appropriately and permitted to bear weight as tolerated; there was no evidence in the record that Dr. Darnell had treated Claimant for anything other than his ankle injury and only saw him four times, though he opined Claimant had limitations involving his upper extremities that dated two years before he even began treating Claimant. (Id. at 15-17)

7

The ALJ also noted his opinion was inconsistent with the overall evidence of record, which included Claimant's activities of daily living; the ALJ did not rely solely upon Claimant's activities of daily living to conclude he remained capable of medium work. (Id. at 17-18) The Commissioner contends that substantial evidence supported the ALJ's decision and asks this Court to affirm. (Id. at 18)

In reply, Claimant asserts that Dr. Darnell's opinion is not extreme, but the ALJ's RFC given Claimant's medical background and age pushes the limits of discretion; further, the ALJ's finding that Claimant's left ankle injury had healed is contradicted by the medical evidence. (ECF No. 14)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Both Knees and Left Leg Treatment:

In January of 2018, imaging showed that Claimant had mild to moderate tricompartmental right knee osteoarthritis (Tr. at 484). At a consultative examination that month, he had a limping gait that was not unsteady or antalgic, had no difficulty going from sitting to standing or getting on and off the exam table, and needed no handheld assistive device (Tr. at 480). He was only able to complete a half squat due to knee pain, and he had decreased knee range of motion, but he had 5/5 muscle strength with no evidence of atrophy, he was able to walk on heels and toes, and he had a slightly unsteady tandem gait (Tr. at 481-482). Later that month, Claimant complained to a treating provider about knee pain (Tr. at 934). On examination, he had normal range of motion,

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

normal strength, "but very little" swelling on the knee and very mild crepitus (Id.). The following month, he had crepitus bilaterally, slight pain when palpating the medial inferior aspect of the patella, and no edema, erythema, or warmth (Tr. at 867).

Knee imaging in April 2018 showed mild to moderate medially joint compartment narrowing and mild joint space spurring, but no abnormality of bone architecture or alignment noted; the impression was degenerative joint disease (Tr. at 713). In May 2018, strengthening exercises were recommended, as Claimant's osteoarthritis was not deemed to be severe enough to warrant replacement surgery (Tr. at 950).

In September 2018, Claimant suffered a left tibial fracture when drywall/sheets of plywood fell on him. (Tr. at 602, 696, 764) A Lower Extremity Venous Duplex Evaluation revealed no evidence of deep vein thrombosis (Tr. at 701), and an x-ray showed a fracture in Claimant's lateral aspect of his tibial plateau and a plantar calcaneal spur. (Tr. at 703)  An x-ray of his left knee in October 2018 showed mildly displaced comminuted fracture in the periphery of the lateral tibial plateau, unchanged, moderate suprapatellar effusion, peripherally sclerotic bone lesion without aggressive features and a couple of small intra-articular bodies in the joint space projecting in the region of the medial tibial spine. (Tr. at 693) At the time, he was able to put some weight on it and was not using crutches. (Tr. at 764)

Records from November 2018 indicate that Claimant reported intermittent pain and discomfort; he was ambulating without an assistive device. (Tr. at 782) He was instructed to walk and stand at tolerated and physical therapy was ordered for strength and endurance training for his left knee. (Tr. at 792)

At a follow-up appointment in December 2018, Claimant reported being unable to do

physical therapy though had been ambulating; he continued to complain of intermittent pain (Tr. at 746). His injury was noted to be healed and he was instructed to continue weight bearing as tolerated. (Tr. at 747) An x-ray of his left knee showed some interval healing and moderate size joint effusion. (Tr. at 758)

In February 2019 Claimant started physical therapy (Tr. at 553). At the beginning of physical therapy, he had an antalgic gait, full strength in his right knee, slightly reduced strength in his left knee, and reduced range of motion (Tr. at 554). By the time he was discharged from physical therapy in March 2019, he was feeling much better, reported only 1/10 pain at worst, was able to ascend and descend stairs reciprocally, and was returned to his prior level of functionality (Tr. at 564). He had a normal gait, improved range of motion, and full strength in both knees (Tr. at 565).

General musculoskeletal examinations throughout the record mostly recorded normal range of motion and no edema (see, e.g., Tr. at 760, 844, 893, 906, 958, 976, 991, 1362).

Treatment for Carpal Tunnel Syndrome:

In January 2016, Claimant had an EMG that showed severe bilateral carpal tunnel syndrome (CTS) with no ulnar entrapment neuropathy (Tr. at 419). In May 2016, he had left carpal tunnel release surgery (Tr. at 658). In July 2016, imaging of the left wrist showed irregularity of the articular surface of the distal radius possibly related to a minimally displaced or old fracture deformity, slight narrowing of the radiocarpal joint, and degenerative changes at the first metacarpophalangeal joint (Tr. at 671).

At a consultative examination with Deidre Parsley, D.O., in January 2018, Claimant had positive Tinel's signs at his elbows and right wrist, negative Phalen's signs, and tenderness of the

right epicondyle (Tr. at 480). His grip strength was symmetrical and slightly decreased, but his fine manipulation was intact, and he had full sensation in his hands (Tr. at 482). In February 2018, Claimant complained of right elbow pain and had mild tenderness to palpation in the radial head, but good range of motion, full strength, and no edema, erythema, or warmth (Tr. at 867). An elbow x-ray was normal (Tr. at 873).

In July 2018, Claimant complained of right hand pain and paresthesias (Tr. at 488). He reported that he had improvement on the left after surgery but still had some symptoms (Id.). He had a positive Tinel's sign on the left at the fingertip, MP joint, and carpal tunnel, and symptoms on the right were consistent with moderate CTS (Id.). The following month, he had carpal tunnel release surgery on the right (Tr. at 489), and at a one-week follow up, he was healing well (Tr. at 488).

In February 2020, Claimant complained of numbness and tingling and had decreased sensation in the median nerve distribution, right greater than left, but minimal muscle wasting (Tr. at 1241). The following week, he again reported numbness and tingling and stated that his symptoms had not improved significantly after surgery (Tr. at 1236). He had positive Tinel's and Phalen's signs, but his sensation and strength were intact (Id.). An EMG in March 2020 showed little change since his 2016 study (Tr. at 1365).

Left Ankle Treatment:

On October 23, 2019, Claimant suffered a severe injury to his left ankle from an ATV when he tried to stop it while intoxicated (Tr. at 1352). Diagnostic imagining indicated he had bimalleolar fractures at the left ankle (Tr. at 1359). ER treating providers performed a left ankle reduction and placed his ankle in a splint (Tr. at 1352). The following week, he had deformity

consistent with ankle subluxation and swelling, but no pain at the knee or hip with range of motion, and he underwent ORIF[3] surgery (Tr. at 1340, 1342-1343). The next day, he reported to a medical resident, Gregory A. Darnell, M.D., that his pain was controlled and denied numbness or weakness, and he was advised to remain non-weight bearing (Tr. at 1335).

On November 13, 2019, Claimant had no new complaints for his orthopedist and said he had not been walking on his foot, but he presented with a dirty splint and Ace wraps that were soaked through with muddy water (Tr. at 1318). X-rays showed that the ORIF surgery had failed and he had lateral subluxation of the talus (Tr. at 1319) probably due to Claimant having put weight on the split (Tr. at 1320). Two days later, he had additional surgery to remove hardware from the previous surgery and place a hindfoot fusion nail (Tr. at 1304).

Two weeks later after that surgery, Claimant followed up with his orthopedist and was using a walker (Tr. at 1298). His wound was slightly weepy, and he had no pain with knee or hip motion (Tr. at 1299). On January 2, 2020, Dr. Darnell observed that Claimant was non-weight bearing with a cam boot and that his ankle remained swollen, erythematous, and warm, with cellulitis next to the incision (Tr. at 1291). The following week, Dr. Darnell noted that the redness and swelling had decreased, that Claimant was using a cam boot with a walker, and that he had no numbness, weakness, or tingling (Tr. at 1285-1286). At an orthopedic follow up on January 15, 2020, Claimant was using a walker and cam boot and he had serious wound drainage (Tr. at 1280). An x-ray showed stable ankle fusion hardware, a bony graft or callus at the bimalleolar location, and a mild degree of talar tilt (Tr. at 1283).

On January 20, 2020, Claimant underwent an operative debridement of his wound (Tr. at

---

[3] **O**pen **R**eduction **I**nternal **F**ixation. See ORIF | definition of ORIF by Medical dictionary (thefreedictionary.com).

1261). At that point he had been weight-bearing for about a week, and the day after debridement he was moving his extremities without difficulty, had intact sensation, and was able to flex and extend his knee without difficulty (Tr. at 1265). He was discharged home on January 24, 2020 with a wound VAC[4] (Tr. at 1267). That same day, Claimant had his first home care visit for assistance with wound care and dressing changes (Tr. at 1165-1173). On February 5, 2020, Claimant had a plastic surgery appointment regarding his wound, he was using a scooter to ambulate, and he was moving all extremities without difficulty (Tr. at 1251-1252). That same day, his orthopedist recorded that sensation was grossly intact (Tr. at 1256).

On February 13, 2020, at a plastic surgery appointment, Claimant was using a rolling walker and had no acute infection (Tr. at 1247). A week later, his orthopedist recorded that he was doing well and could begin weight bearing as tolerated (Tr. at 1240, 1242). At a plastic surgery appointment on February 27, 2020, treatment notes document that he was ambulating on his left leg with a walking boot and had regained some strength in his left foot (Tr. at 1236). He had healthy granulation tissue around his wounds, and they were healing well enough that he no longer needed wound VAC therapy (Tr. at 1236-1237). At a wound check with Dr. Darnell on March 4, 2020, Claimant was ambulatory with a walker, his wounds had continued to improve and were healing appropriately, and his sensorimotor examination was intact, though the extremity exhibited 1-2+ pitting edema (Tr. at 1231). On March 18, 2020, Claimant's orthopedist noted an x-ray showed postsurgical change with a hindfoot fusion nail in place, sclerosis at the "talotibular" joint, no hardware failure, and unchanged alignment, and he advised that Claimant could continue weight-bearing as tolerated in his cam boot, with no mention of a walker (Tr. at 1225). His

---

[4] **V**acuum **A**ssisted **C**losure. See <u>Wound VAC | definition of wound VAC by Medical dictionary (thefreedictionary.com)</u>.

patellofemoral space had improved, his incisions were healing well, and he had no pain with palpation, decreased motion, significant effusion, and grossly intact sensation (Tr. at 1226).

Physical Therapy Records:

Claimant was treated every two to three days by Personal Touch Home Care of Virginia from January 24,2020 to March 9, 2020. (Tr. at 1165-1223) Initially, Claimant required assistance ambulating and transferring positions due to his left lower extremity injury. (Tr. at 1165, 1169) He struggled with leaving his home without severe weakness and was noted to have an unsteady gait/balance, required an assistive device, and was able to walk "only with the supervision or assistance of another person at all times." (Id.)

Consultative Examination:

On January 18, 2018, Claimant was evaluated by Deidre Parsley, D.O. (Tr. at 477-482) She noted Claimant walked with a limping gait, which was not unsteady or antalgic and did not have difficulty going from sitting to standing or getting on and off the examination table. (Tr. at 480) It was further noted that he did not require the use of a handheld assistive device. (Id.) Tenderness was noted on the lateral epicondyle. (Id.) Tinel's sign was positive at the elbows and right wrist but negative on the left wrist; a surgical scar was noted on the left wrist from a prior carpal tunnel release surgery. (Id.) Claimant's hands had no tenderness, redness, warmth, swelling, or atrophy, and he was able to make fists bilaterally. (Id.) His grip was rated 4/5 bilaterally. (Id.) He could write with his dominant hand (right) and pickup coins with either hand without difficulty; range of motion of the finger joints of both hands was within normal limits. (Tr. at 480-481)

The examination of Claimant's legs revealed no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus of the knees, ankles or feet (Tr. at 481). Examination of the dorsolumbar

spine indicated decreased lumbar lordosis without evidence of paravertebral muscle spasm. (Id.) Straight leg raise test in the sitting and supine position was normal, though low back pain was reported during supine positioning with 60-degree flexion of each leg. (Id.) Claimant could stand on his left leg without difficulty, but was slightly unsteady standing on his right leg. (Id.) Muscle strength was 5/5 bilaterally in both upper and lower extremities and neurologically unremarkable. (Id.) Claimant could walk on heels and toes but could perform one-half squat due to knee pain and was slightly unsteady performing tandem gait. (Id.) Some reduced range of motion was noted during testing and his right eye vision was impaired and all other findings were normal. (Tr. at 482) She assessed Claimant with: decreased visual acuity based on his history of right eye injury with probable corneal transplant; polyarthralgias; degenerative joint disease of the hands; chronic lumbalgia; carpal tunnel syndrome, status post left carpal tunnel release; hypertension; history of hypercholesterolemia; gastroesophageal reflux disease; and chronic tobacco use, by history.  (Tr. 481)

Medical Opinions and Prior Administrative Findings:

In an April 5, 2016 decision on a prior claim, an ALJ determined that Claimant had the RFC to perform medium work with additional limitations: that he could climb ramps and stairs occasionally; could never climb ladders, ropes, or scaffolds; could frequently balance, stoop, kneel, crouch, and crawl; has limitations in near and far acuity and depth perception in his right eye; could have occasional exposure to unprotected heights and moving mechanical parts; could perform simple, routine tasks and simple work related decisions; could respond appropriately to supervisors and coworkers frequently and to the public occasionally; and could deal with simple, work-related decisions (Tr. at 61-66).

15

On February 25, 2019, at the initial review stage for the claims at issue here, Rabah Boukhemis, M.D., reviewed the record relating to Claimant's physical impairments and determined that he could perform  work at the medium exertional level; could frequently stoop, balance, kneel, and crouch; could occasionally crawl and climb ramps, stairs, ladders, ropes, and scaffolds; and should avoid concentrated exposure to extreme cold, vibration, and hazards (Tr. at 114-116). At the reconsideration stage, on August 17, 2019, Narenda Parikshak, M.D., reviewed the record relating to Claimant's physical impairments and agreed with Dr. Boukhemis' findings (Tr. at 155-157).

On March 4, 2020, Dr. Darnell filled out a checkbox form on which he noted that he saw Claimant for weekly to monthly wound checks and had examined him four times (Tr. at 1155). He listed several diagnoses, including left ankle wound after failed ORIF and then repair, dysthymia, GERD, HLD, HTN, tobacco use, ophthalmologic abnormalities, CTS, alcoholism, arthritis, and chronic pain from CTS and arthritis (Id.). He opined that Claimant's pain was often severe enough to interfere with attention and concentration; that Claimant could sit and stand for 20 minutes at a time and walk for 10 minutes at a time; and that Claimant could sit, stand, and walk for a total of less than two hours each in a normal workday (Tr. at 1155-1156). He further opined that Claimant needed a job that permitted shifting position at will and that he could frequently lift and carry 10 pounds, occasionally 20, and never 50 (Tr. at 1156). Dr. Darnell opined that Claimant would be absent from work more than four times a month and off task more than 20% of the time, and he opined that Claimant could only occasionally finger, feel, and grasp (Tr. at 1157). He concluded that these limitations dated back to at least September 30, 2017, and he declined to offer an explanation for that opinion in the space provided on the form (Id.).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he resided in his parents' basement and did not have a driver's license due to a DUI (Tr. at 35-36). He indicated he can walk to get to a bus, about three quarters of a mile from his home (Tr. at 36). He stated that his right knee is painful, and that it "pops and snaps" when he moves it, making it difficult to walk, though "once [he] get[s] up and get standing straight it's okay to move." (Tr. at 38-39) Claimant was still wearing a boot for his left ankle, which he injured on a six-wheeler trying to drive over to see a friend who lived about a quarter mile down a hill from him (Tr. at 39-40). Claimant testified that he used the six-wheeler because his knees and back hurt too much to walk down the hill and then up again to return home. (Tr. at 40) He said his back and knee pain is a constant dull and aching pain, but a new medication he was put on several months ago helps a little. (Tr. at 40-41)

Claimant testified that although he had both hands operated on for his carpal tunnel syndrome, it did not help, and that he believed his hands were getting worse; he testified that he drops things and has to switch holding things with his hands because they go numb and he loses his grip (Tr. at 41-42). He wears splints on both hands at night (Tr. at 42).

Claimant testified that he spends his days "[g]etting in, up and down, laying in the bed here and watching T.V."; he does not do yard work, but does some housework, such as dishes and laundry for himself. (Tr. at 44) He will occasionally go to the store, and will use the riding carts provided because he cannot stand for too long; he estimated that he can stand about 10 to 15 minutes at most (Id.). With the exception of his left ankle issue, Claimant testified that these limitations were about the same around September 2017. (Tr. at 45)

17

Vocational Expert ("VE") Testimony:

The VE classified Claimant's past relevant work as a commercial or industrial cleaner as unskilled and heavy in exertion, but as Claimant performed it, light; his prior work as a floor waxer as unskilled and medium in exertion and as a display maker as skilled and medium. (Tr. at 47) The ALJ then asked the VE to assume a person of Claimant's age, education, and work experience with the controlling RFC, *supra*. (Tr. at 47-48) In response, the VE testified that while the individual could perform Claimant's past relevant work as a commercial/institutional cleaner. (Tr. at 48-49) In addition, the individual could perform other jobs such as hospital cleaner and linen room attendant, both unskilled and medium in exertion. (Tr. at 49-50) The VE also testified that if the individual were off-task more than 10% of the day or absent more than one day per month, then this would exceed an employer's tolerance. (Tr. at 50)

In response to questions from Claimant's counsel, the VE confirmed that the individual would not be able to perform any medium exertional jobs if the individual were restricted to only occasionally be able to grip, handle and feel; the VE also testified that if the individual could only occasionally lift 20 pounds and frequently lift 10 pounds, all medium jobs would be eliminated, as this represented only light work (Tr. at 51). The VE further testified that if the individual was only able to stand and walk less than two hours in an eight-hour day, the individual would be limited to sedentary jobs (Id.).

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

There are two relevant periods at play in this case:

In terms of his application for DIB, Claimant must show that he became disabled prior to the expiration of his insured status on September 30, 2017. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. To be entitled to DIB in this case, Claimant bears the burden of showing that he became disabled prior to September 30, 2017, the date when his insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after his date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370,

at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is from April 1, 2013, the date of Claimant's alleged disability onset, to September 30, 2017 when his insured status expired (Tr. at 14).

In terms of his application for SSI, the relevant period is from the application filing date of September 24, 2018 through the date of the decision, April 21, 2020. (Tr. at 22); see also, 20 C.F.R. §§ 416.335, 416.340.

Evaluation of Medical Opinion Evidence:

As noted *supra*, Claimant alleged that the medium RFC assessment is erroneous due in large part to the ALJ's treatment of Dr. Darnell's opinion. (ECF No. 12 at 14) To the extent that Claimant argues that the ALJ failed to properly evaluate these experts' opinions, the undersigned notes that the ALJ explicitly applied the regulatory framework pursuant to Sections 404.1520c and 416.920c to claims filed after March 27, 2017. (Tr. at 17, 19) Additionally, it is known that the RFC assessment lies squarely with the ALJ, not with any medical provider/examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). The applicable Regulations provide that a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). The Regulations also define "findings . . . about a medical issue made by our Federal and State agency

medical and psychological consultants at a prior level of review" as "prior administrative medical finding[s]." Id. at §§ 404.1513(a)(5), 416.913(a)(5).

In this case, the ALJ properly applied Sections 404.1520c and 416.920c, which emphasize the supportability and consistency factors when assessing the persuasiveness of the medical opinions of record; moreover, an adjudicator is not bound to give any specific weight or deference to any medical provider's opinion, including those provided by treating sources. Id. §§ 404.1520c(a), 416.920c(a). Instead of assigning weight to medical opinions, the ALJ now just considers the persuasiveness of a medical opinion (or a prior administrative medical finding). Id. Critically, the source of the opinion is not the most important factor in evaluating its persuasive value, instead, the most important factors are supportability and consistency. Id. §§ 404.1520c(b)(2), 416.920c(b)(2). When discussing the finding about whether an opinion is persuasive, the ALJ need only explain how she considered the "the most important factors" of supportability and consistency. Id. §§ 404.1520c(c), 416.920c(c). The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. Id. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3).

With regard to the opinion evidence, the ALJ first addressed the prior ALJ's decision, who determined Claimant remained capable of performing a less than full range of medium work. (Tr. at 19, 53-72) The ALJ found the prior decision persuasive, noting that Claimant's severe medically determinable impairments are generally the same and stable. (Tr. at 19) Next, the ALJ considered the state agency medical consultants' opinions, and also found them persuasive, because they were consistent with the medical evidence of record as a whole, and Claimant "generally presented with benign findings" on examinations. (Tr. at 19, 77-98, 99-120, 123-142, 143-162) The ALJ also

noted that these experts are familiar with the disability program (Id.).

Regarding Claimant's treating source opinion, the ALJ determined that Dr. Darnell's opinion was not persuasive, noting that he is Claimant's "wound care doctor" and that he opined Claimant could perform work at the sedentary level based on Claimant's post-ankle surgery. (Tr. at 19, 1154-1157) The ALJ noted that "[s]ince treatment, the claimant's wound healed and symptoms stabilized, as discussed above. This determination is inconsistent with the medical evidence of record as a whole." (Tr. at 19)

Earlier, or "as discussed above" in the written decision, at step two, the ALJ reviewed the evidence concerning Claimant's ankle impairment, finding it not severe, because it did not cause more than minimal limitations to do basic work activities. (Tr. at 15) She acknowledged Claimant suffered an ankle fracture, but his symptoms related thereto had "resolved post-surgery." (Tr. at 15, 915, 1225, 1228, 1231, 1240, 1283, 1335)[5] At step three, the ALJ observed that the record contained no statement by an acceptable medical source stating that Claimant medically equals or meets a Listing. (Tr. at 16) She also considered the medical evidence in light of Listing 1.02 criteria, which concerns major dysfunction of a joint, and found that the evidence of record did not show Claimant uses a walker, two crutches, or two canes to walk and that physical examinations generally indicated intact gait. (Tr. at 16) The ALJ considered Claimant's limitations in all functional areas, determining they were moderate, as he remains able to care for his personal hygiene independently, take medication without reminders, prepares simple meals, complete household chores, go out daily, shop in stores, spend time with others, and watching television. (Tr. at 16, 304-313, 324-331)

---

[5] The ALJ referenced medical records dated September 25, 2018, March 18, 2020, March 4, 2020, February 20, 2020, January 15, 2020, and October 31, 2019 respectively.

In her assessment of Claimant's RFC, the ALJ also considered Claimant's testimony and statements in support of his applications for benefits, acknowledging his allegation that he is unable to work due to ankle pain, among other issues, including bilateral knee pain, back pain, carpal tunnel syndrome, and other maladies. (Tr. at 18, 294-303, 316-323) The ALJ noted Claimant's severe and non-severe impairments made it difficult to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climbing stairs, see, complete tasks, concentrate, or use his hands. (Tr. at 18, 304-313, 324-331)

The ALJ went on to review Claimant's statements about the intensity, persistence, and limiting effects of his symptoms, finding them inconsistent with the evidence of record as a whole: regarding his carpal tunnel syndrome, the ALJ observed that EMG studies from January 2016 and March 2020 were generally unchanged, although records showed it improved with surgeries and injections, and despite having slightly decreased grip strength, he maintained full range of motion in his hands (Tr. at 18, 419-420, 1365, 480-481, 487-490); regarding his bilateral knee pain, the ALJ acknowledged that imaging showed osteoarthritis and degenerative joint disease, and that Claimant received medication and physical therapy for his left knee, which showed improvement by his seventh session (Tr. at 18, 484, 713, 529-608, 530); regarding his history of spondylosis, the ALJ observed that lumbar x-rays showed multilevel degenerative disc and facet disease, and that Claimant had some residual pain, but physical therapy helped overall, and that he presented with benign findings except for slightly decreased range of motion in the lumbar spine at the consultative examination (Tr. at 18, 373-418, 413, 485, 477-486).

Following this review, it is apparent that the ALJ discharged her duty under the Regulations concerning the medical opinions, noting how they were supported with the evidence of record,

while recognizing where they fell short of supportability; in addition, the ALJ reconciled where the opinion evidence was consistent and inconsistent with the overall record. In sum, the ALJ provided an adequate explanation for how she found the opinions persuasive or not, and properly considered them and incorporated them to the extent she found them supportive and consistent with the record in the RFC assessment.[6]

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Darnell's opinion is supported by substantial evidence.

The RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). As noted *supra*, the RFC determination is an issue reserved to the Commissioner. Id. §§ 404.1546(c), 416.946(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller, 459 F. App'x at 231.

---

[6] On judicial review, the Commissioner's factual findings are " 'conclusive' if supported by 'substantial evidence.' " See Biestek v. Berryhill, 139 S.Ct. 1148, 1153 (2019). Given that substantial evidence is "more than a mere scintilla" and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence due to the ALJ's assessment of Dr. Darnell's opinion, as noted *supra*, the ALJ's consideration of this evidence was sufficient under the pertinent Regulations.[7] With respect to the ALJ's RFC assessment through Claimant's DLI, September 30, 2017, the undersigned **FINDS** substantial evidence supports a medium exertional level RFC. Indeed, the ALJ's observation of "benign findings" during that period echoes the assessments made by the medical consultants and the objective medical evidence up to that point.[8] In this case, the ALJ's comprehensive review of the record evidence, including Claimant's testimony and subjective statements, his activities of daily living, the objective medical findings, his treatment history, and the medical opinion evidence (Tr. at 15-19) provided sufficient explanation for the medium RFC

---

[7] As observed by the Commissioner, Dr. Darnell's endorsement of restrictions regarding Claimant's abilities in fingering, feeling, grasping, lifting, and carrying (ECF No. 13 at 16-17, n.6) as well as his estimation that Claimant would be absent from work more than four times a month and off task greater than 20% of the workday (See, Tr. at 1156-1157) strains credibility, especially since Dr. Darnell only saw Claimant four times and only for treatment of his ankle wound. Indeed, Dr. Darnell's opinion that Claimant's limitations date back to at least September 30, 2017 (Tr. at 1157) without providing any further explanation for this fails to rise to the supportability and consistency standards under the Regulations.

[8] As noted *supra*, the ALJ observed that an EMG from March 2020 was generally unchanged from an EMG performed in January 2016, and that Dr. Parsley reported only slight decrease in grip strength and full range of motion in both hands (Tr. at 18, 419-420, 1365, 480). Though not pertinent to the issues on appeal, the ALJ also noted that "[i]n terms of his right eye blindness" due to an injury in 1998, following a corneal transplant in 2014, Claimant's August 2019 eye exam indicated his glaucoma was stable since October 2018, and he had "an excellent response to drops." (Tr. at 18, 477-480, 1158-1163) The ALJ further noted that although Claimant did not allege mental illness in his Disability Report (Tr. at 18, 294-303), he received outpatient mental health treatment between 2014 and 2016, and treatment notes also recorded benign findings, despite his mental symptoms generally exacerbated by substance and alcohol use, "which is in remission"; Claimant's mental status examination was also generally "benign." (Tr. at 18, 421-474, 503-509)

From the undersigned's review, there are not too many medical records from prior to September 30, 2017, but those during that period showed "benign findings": a treatment note dated September 27, 2016 concerned follow up care for elevated blood pressure reported Claimant had no acute complaints, save for some "worsening LE swelling in his left leg. He states 1 month ago he was cycling and felt a pull behind his left knee and since then he has had knee pain and swelling in his leg." (Tr. at 856-857) The physical examination from that day was unremarkable, and Claimant denied joint pain, joint swelling, weakness, muscle pain and back pain. (Tr. at 857) Another treatment note dated January 23, 2017 concerned Claimant's report of occasional muscle twitching, but "no pain." (Tr. at 882) A subsequent record dated December 1, 2017 for medication refills noted Claimant had not been seen in that office since a year ago (Tr. at 892), but presented in no acute distress, and with regard to his musculoskeletal system, he was "[m]oving extremities with ease. No LE edema." (Tr. at 893)

assessment through Claimant's DLI allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015).

However, with respect to the medium RFC determination since the expiration of Claimant's DLI, and especially since his October 2019 ankle fracture, the evidence of record is less probative. As pointed out by Claimant, the gravamen of the opinion evidence, as well as the evidence produced by consultative examiners, predates this injury. (ECF No. 12 at 17) Moreover, although the ALJ determined that Claimant's ankle injury was non-severe (Tr. at 15), and by the time of the administrative hearing, it had not yet been a "continuous period of at least 12 months"[9] since his ankle fracture, it still begs the question as to whether Claimant was really capable of performing work at the medium exertional level "through the date of this decision". (Tr. at 22)

Recently, the Fourth Circuit emphasized that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The undersigned notes that while the ALJ's determination that Claimant's ankle impairment was not severe, as "his symptoms resolved post-surgery", the final medical record concerning this injury is dated March 18, 2020 and states that Claimant was to "[c]ontinue to follow with plastic surgery regarding medial and lateral wounds", and "[w]eightbearing as tolerated in boot." (Tr. at 15, 1225) The physical examination of his left lower extremity that day also states: "His medial and lateral incisions were "healing with good granulation tissue. There is no purulence or active drainage. He has no pain with palpation. He has decreased motion a significant effusion. He demonstrates EHL

---

[9] Pursuant to 20 C.F.R. § 404.1509.

and FHL. Sensation is grossly intact has brisk cap refill." (Tr. at 1226) The x-rays taken that day revealed that Claimant's left ankle fusion remained unchanged since the initial postoperative x-rays taken on December 4, 2019. (Tr. at 1228) This collective evidence does not suggest that the symptoms related to Claimant's ankle impairment had "resolved" at that time. (Tr. at 15)

As noted by Claimant, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds[]" and "[i]n most medium jobs, being on one's feet for most of the workday is critical." (ECF No. 12 at 15; citing Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *6); see also 20 C.F.R. § 404.1567(c).

The ALJ's erroneous narrative of the record concerning *this particular* injury, coupled with the ultimate determination that Claimant remained capable of performing medium work even *since* this injury leaves this Court "to guess about how the ALJ arrived at [her] conclusions", therefore remand is necessary. Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015). Because the ALJ's assessment of the factual evidence concerning this impairment is not supported by the medical records, her finding related thereto is not supported by the substantial evidence. See Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) ("The deference standard accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence.") (citing Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . ."); see also, Schomas v. Colvin, 732 F.3d 702, 709 (7th Cir. 2013). Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment since Claimant sustained his ankle impairment is not based upon substantial evidence because it remained unclear at the time of the administrative hearing and the written decision that Claimant

really was capable of performing his past relevant work as a commercial cleaner, let alone any other medium-level work through the date of the decision.

Because the issues presented in this appeal necessarily involve the reconciliation of conflicting evidence, and the weighing of evidence, it is beyond this Court's jurisdiction to remand with an award for benefits. See SSR 96-8p, 1996 WL 3741784, at *7; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Accordingly, despite Claimant's alternative request for reversal and an award of benefits, remand, not reversal, is the proper remedy. I.N.S. v. Ventura, 537 U.S. 12, 16-17 (2002); Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013).

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand (ECF No. 12), **DENY** the Defendant's request to affirm the decision below (ECF No. 13), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to allow the ALJ to redetermine Claimant's RFC assessment since his October 23, 2019 ankle injury.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: May 25, 2021.



Omar J. Aboulhosn
United States Magistrate Judge